HARLEY v. LOUISVILLE & N. R. CO.

(Circuit Court, D. Tennessee. June 2, 1893.)

RAILROAD YARD—YARD MASTER — FOREMAN — SWITCHMAN—VICE PRINCIPAL—FELLOW SERVANTS.

> A railroad yard was shown to consist of side tracks upon either side of the main track, adjacent to some principal station or depot, where arriving trains are separated and departing trains made up, and where such switching is done as is essential to the proper placing of cars for deposit or departure. All operation of the yard was under the direction and supervision of a yard master. The several yard switching crews were each under the control of a foreman or conductor. A brakeman of one of the crews claimed to have been injured by the negligence of his foreman in giving a signal at improper time, whereby the train was moved, and ran over his foot. *Held*, under authority of Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. Rep. 914, that the foreman and switchman were fellow servants, and the railroad company was not liable for negligence of foreman resulting in injury to switchman.

At Law. Action by T. J. Harley against the Louisville & Nashville Railroad Company to recover damages for personal injuries sustained while in its employment. There was a verdict for plaintiff, and the case is now heard on motion for a new trial. Granted.

Steger, Washington & Jackson, for plaintiff.
Smith & Dickinson, for defendant.

LURTON, Circuit Judge. Plaintiff, while in the employment of the defendant company as switchman, and while engaged in switching cars in the yard of the company at Nashville, was run over, and lost a leg. The jury have returned a verdict in his favor, and a motion for a new trial has been argued. In its present attitude the case must turn upon the single question as to whether the negligent movement of the train while plaintiff was between cars in the discharge of his duty, was due to signals given by a fellow servant. Harley, the plaintiff, belonged to a switching crew engaged in the yards of the company at Nashville. A "switching crew," or "train," as sometimes designated by witnesses, consisted of an engine, an engineer and fireman on the engine, and several switchmen, all under the control of a superior servant, designated generally as the "foreman," though occasionally spoken of as "conductor" of the "switching train." The force in the defendant's yards at Nashville seems to have been divided into several such crews, each under control of a foreman, and the whole under the general control and supervision of an officer of

still higher grade, designated "yard master." The yard master has power to employ and discharge all yard employes, including the foremen of switching crews. The yard of the company, as the court may know from its general knowledge of the methods and appliances of railroad companies, as well as from the evidence in this case, consists of side tracks upon either side of the main tracks, and adjacent to some principal station or depot grounds, where cars are placed for deposit, and where arriving trains are separated and departing trains made up. It is the place where such switching is done as is essential to the proper placing of cars either for deposit or for departure. All the operations of the yards at Nashville are under the direction and supervision of a yard master, and his subordinates in control are the foremen of the several gangs or crews of men engaged in the movement and switching of cars within the yard. The yard master's orders were communicated to the foreman, and the foreman had control and direction of the crew under him, and through them executed the orders of his superior with regard to the switching he was directed to do.

Plaintiff was directed by his foreman to uncouple certain cars attached to others, which had been moved from a track upon which they had been standing, which cars, when uncoupled, were to be deposited upon a particular track in the yard. While endeavoring to uncouple, and while between the cars, the train was moved. He was so jostled as to lose his footing, fell, and was run over. It was clearly shown that when a switchman or brakeman was to make or unmake a coupling it was his business to signal the engineer for such movement of the train as was necessary in the discharge of his duty. There was evidence that plaintiff found difficulty in uncoupling, and came out and gave a signal to the engineer to "give him the slack," and that the movement which resulted in his injury was due to his own signal. On the other hand, there was evidence tending to show that, while plaintiff was between the cars, the foreman gave a signal to move backwards, and that the engineer's compliance with this signal brought about the accident. The latter is the most favorable view of the case for the plaintiff, and was the view argued by plaintiff, and the only view upon which any recovery could be predicated. If it be assumed that the verdict is based upon the theory that the foreman negligently signaled for a movement of the train before plaintiff had come out from between the cars, ought it, under the law, to stand? There was evidence sufficient to justify the jury in finding, as they must have done, that the foreman negligently ordered the movement of the train while plaintiff was in a dangerous situation. Was this foreman a fellow servant with the plaintiff, for whose negligence the company was not liable? I instructed the jury that he was not a fellow servant, if they found that he had immediate command and control of the switching crew and train, as to the employes under him, such as the engineer, foreman, and switchmen. I also instructed them that, if plain-

tiff was subject to the control and direction of the foreman,. and that, if under such direction plaintiff undertook to uncouple cars in the train being handled under directions of the foreman, and if, while obeying this order, the foreman negligently caused the train to be moved, thereby knocking down and injuring plaintiff, the defendant company would be liable; that in such case the foreman stood as a vice principal, and represented the master, and his negligence would be the personal negligence of the master.

The test of responsibility was made to consist in the fact that the negligence was that of the immediate superior of the plaintiff, who had a right to direct and control the plaintiff in the matter and upon the occasion when the injury was sustained. This is the common law, as explained and expounded by the supreme court of Tennessee, the state wherein the injury was sustained and in which the suit was brought. Railroad Co. v. Bowler, 9 Heisk. 866; Railroad Co. v. Collins, 85 Tenn. 227, 1 S. W. Rep. 883; Railroad Co. v. Wheless, 10 Lea. 741. I was further of opinion that the principle upon which the case of Railway Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. Rep. 184, rested, was in harmony with the law of Tennessee. Since charging the jury, and pending this motion for a new trial, the opinion of the supreme court of the United States in the case of Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. Rep. 914, has been received. This case was not decided until April 24, 1893. That court, after most mature consideration, held in that case: (1) That the question as to who is and who is not a fellow servant is a question of general, and not local, law, and to be determined by courts of the United States "by a reference to all the authorities, and a consideration of the principles underlying the relations of master and servant." (2) That "the mere control of one servant over another in doing a particular piece of work" does not destroy the relation of fellow servant. (3) That the liability of the master to a servant who has sustained an injury through the negligence of another servant depends upon conditions wholly independent of the mere superiority of the negligent servant, or his control over the injured servant.

The conditions, as adjudged in the Baugh Case, are these:

(1) If the negligence of the superior servant was in regard to some positive duty, which by law the employers owe to the employe, as in regard to the duty of furnishing the employe a reasonably safe place in which to work, or reasonably safe appliances with which to work, or that he will not associate the servant with other servants unfit and careless, then for every such act of negligence the master is liable, for he cannot, by delegating to an agent the discharge of an affirmative duty, escape his responsibility to the injured servant.

(2) If the negligence be not the breach of some positive duty, then the master is only liable if it be his personal wrong, in contradistinction to the legal negligence just mentioned.

Where the master is an individual, the difficulty in regard to this aspect of his responsibility to his servants cannot be very great;

but where the master is a corporation the courts have found great trouble in determining just where the negligence is to be regarded as that of the master and ceases to be that of a fellow servant. A corporation can act only through agents. It has no personality. Which of these agents is to be regarded as acting for and representing the master is the point in regard to which the decided cases have been in hopeless conflict. Which of these many servants are to be regarded as "vice principals," and which of them are to be regarded as "fellow servants?" All servants are in some sense agents of such a master; all, in some degree, represent and stand for the master; but this is so in regard to the employes of an individual, and yet it cannot be pretended that all therefore represent and bind him by their negligent or wrong acts.

With regard to the control which is assumed to underlie the relation of master and servant, Mr. Justice Brewer, in the Baugh Case, said:

"Prima facie, all who enter into the employ of a single master are engaged in a common service, and are fellow servants; and some other line of demarcation than that of control must exist to destroy the relation of fellow servants. All enter into the service of the same master to further his interest in the one enterprise. Each knows, when entering into that service, that there is risk of injury through the negligence of other employes; and that risk, which he knows exists, he assumes in entering into the employment. Thus, in the opinion in the Ross Case, (page 382, 112 U. S., and page 186, 5 Sup. Ct. Rep.,) it was said: 'Having been engaged for the performance of specific services, he takes upon himself the ordinary risks incident thereto. As a consequence, if he suffer by exposure to them, he cannot recover compensation from his employer. The obvious reason for this exemption is that he has, or, in law, is supposed to have, them in contemplation when he engages in the service, and that his compensation is arranged accordingly. He cannot, in reason, complain if he suffer from a risk which he has voluntarily assumed, and for the assumption of which he is paid.' "

But when we are to deal with a corporation acting only through agents, how are we to determine when an act of negligence, committed by one servant to the injury of another, is the personal negligence of the employer, as distinguished from the mere negligence of a coworker and fellow servant, whose negligence he has agreed to risk? The Tennessee rule, and that of several other states, including Ohio, was that, whenever one servant was in control of another, the controlling servant, in the line of his duty, was, as to the subordinate servant, a vice principal, and was therefore the responsible representative of the corporation. The weight of authority, however, was clearly against this as a controlling limitation. It is a limitation expressly repudiated by the United States supreme court, and, as a United States circuit judge, it becomes my duty to conform to the view so strongly announced as is the utterance of that court in the Baugh Case. To hold a corporation liable for an injury sustained by one servant through the personal carelessness of a superior servant, the superior servant must be shown to stand for and represent the corporation as the superintending and commanding head of one of the separate and distinct departments of its service. This is the clear holding of the Baugh Case. There may

be difficulty at times in determining just where the line is to be found between the separate branches or departments of a railroad company's service. There may be difficulty sometimes in determining just who represents the company as the head of such department. The illustrations of such separate branches or departments used by Mr. Justice Brewer in the Baugh Case concern two departments, so separate and distinct that all would be able to discern the servants of one from the servants of the other, and so it would be very evident why each should constitute a separate branch or department. The reason why a railroad train under charge of a conductor should be regarded as a separate branch or department of service is not so apparent, yet the Ross Case is left to stand upon this narrow and apparently untenable ground.

The underlying principle upon which the decision in the Baugh Case was rested is very pronounced. Baugh was a fireman on a locomotive engine. He was injured through the negligence of his engineer. The engine was on detached service, and the engineer had charge and control of it and his fireman. By the rule of the company, in the absence of a conductor, the engineer became "conductor." It was held that an engine out on the road was not a separate branch or department, and that the corporation was not liable for the negligence of the engineer, although he was in control and the superior of the fireman. Upon the department idea, the decision could not be otherwise. The result must be the same in the case under consideration. The foreman of the switching crew, engaged in the yard of the railroad company, under the general control of a yard master, cannot be regarded as the head of a distinct branch or department of a railroad company's service. The words used to designate the kind of control and superintendence necessary to constitute an agent the alter ego of the master are words implying a natural and distinct subdivision of the service. He must superintend or control a "branch" or a "department." To say that the foreman of a switching crew represents the switching branch or department of the company's service would lead to most absurd results. The same might be said of every gang of men under charge of a boss, and doing a particular work, whereby we would at once get back to the test of mere control, so distinctly repudiated in the Baugh Case. If the service or work in which the plaintiff was engaged was a separate branch of the company's service, and to be separated from the general operating department, then the yard master represented the company as the superintendent of such branch or department. The foreman of the crew to which plaintiff belonged was a subordinate under the control and direction of the yard master, and the latter under the orders and control of a still superior servant. This foreman was a mere coworker with plaintiff. That he had control of plaintiff is immaterial. Under the Baugh Case he must be taken to have assumed the risks incident to the negligence of such foreman in immediate control. The danger from "the negligence of one specially in charge of the particular work was as obvious and as great as from that of those

who are simply coworkers with him in it." He assumed and was paid for the risks incident to each.

I conclude by again quoting from the opinion of Mr. Justice Brewer:

"Each is equally with the other an ordinary risk of the employment. If he is paid for the one, he is paid for the other; if he assumes the one, he assumes the other." "Therefore, so far as the matter of the master's exemption from liability depends upon whether the negligence is one of the ordinary risks of the employment, and thus assumed by the employe, it includes all coworkers to the same end, whether in control or not."

The verdict must be set aside and a new trial awarded.